UNITED STATES of America ex rel. Arthur MATHEW et al., Petitioners-Plaintiffs,

v.

John T. NELSON et al., Respondents-Defendants.

No. 72 C 2104.

United States District Court, N. D. Illinois, E. D.

April 13, 1978.

---

Thomas Grippando, Chicago, Ill., for petitioners-plaintiffs.

J. Goldberg, Sp. Asst. Atty. Gen., and Fredric B. Weinstein, Cook County State's Atty., Chicago, Ill., for respondents-defendants.

## SUPPLEMENTAL MEMORANDUM OF DECISION

Before PELL and TONE, Circuit Judges, and McMILLEN, District Judge.

TONE, Circuit Judge.

On August 18, 1975, this three-judge district court, convened pursuant to former 28 U.S.C. § 2281,[1] held that the action should not proceed as a class action, that plaintiffs had standing to sue, and that the court should abstain; and we held the challenged Illinois statute, Ill.Rev.Stat. ch. 91½ § 1–11 (1975), constitutional, denied an injunction, and entered judgment in favor of the defendants.

Plaintiffs then attempted to appeal to the Court of Appeals on the theory that they were appealing from only that part of the judgment that denied declaratory relief. The Court of Appeals dismissed the appeal on the authority of *Wilson v. Edelman,* 542 F.2d 1260 (7th Cir. 1976), holding that it had no jurisdiction "to review the merits of a constitutional claim presented to a properly-convened three-judge court and decided by that court in ruling on a request for injunctive relief," but directing the entry by the district court of "a new judgment from which a timely appeal may be taken to the United States Supreme Court." Plaintiffs then moved under Rules 59(e) and 60, Fed.R.Civ.P., to amend or vacate that judgment, asking this court to reconsider the merits of the case in view of federal cases decided after the court's original decision and additional information with respect to "the views of the scientific community" which had been presented to the Court of Appeals in an *amicus curiae* brief submitted by the American Orthopsychiatric Association.

After reviewing the memoranda submitted by the parties in support of, and in opposition to, the motion to reconsider and the briefs filed in the Court of Appeals in the abortive appeal, this court entered an order vacating the judgment of December 13, 1976 and reopening the proofs. The order recited that it appeared "that the case may turn on issues of fact upon which no oral testimony has been received and that various pertinent learned articles exist which were called to the attention of the Court of Appeals in the proceeding in that court but have not been made a part of this record." The order directed the submission by the parties of copies of the learned articles and excerpts from learned treatises on which they relied for their respective positions and set an evidentiary hearing at which each party was to present two expert witnesses to testify on the issues, as defined in the order.[2] Following that hearing, additional memoranda were filed by the parties.

We have not been asked to reconsider our rulings with respect to standing and absten-

---

1. Repealed by Pub.L.94–381, 90 Stat. 1119, but applicable to any action commenced on or before August 12, 1976.

2. The order defined the issues as follows:
    (a) the degree of accuracy or reliability with which a diagnosis or prediction of "dan-

tion and those rulings will stand. In our earlier decision we denied class standing on the ground that the matter had not been timely called to the attention of the court. Judges Pell and McMillen are of the view that the class ruling should not be disturbed. It can reasonably be assumed that the defendant state officers will be obedient to the ultimate judgment entered in this action even though it technically applies only to the named plaintiffs. The author of this opinion is of the view that we should reconsider our determination on the class issue and grant standing to the plaintiffs to proceed on behalf of the class, although he believes class certification will have no practical significance except in the unlikely event that the action becomes mooted as to the named plaintiffs at some time before the ultimate disposition of the case by the Supreme Court of the United States, to which it will presumably be appealed. The action will not proceed as a class action, the majority having so determined.

Turning to the merits, we hold that plaintiffs are not entitled to injunctive or declaratory relief for reasons we proceed to state.

The Illinois statute,[3] as interpreted by the Illinois Appellate Court in *People v. Sansone,* 18 Ill.App.3d 315, 324, 309 N.E.2d 733, 739 (1st Dist. 1974), *leave to appeal denied,* 56 Ill.2d 584 (1974),[4] must be read as not requiring proof of a recent overt act.[5] It is

---

gerousness" * can be made by those trained in psychiatry, psychology, or medicine in the absence of a recent overt act or threat,

(b) the degree of such accuracy or reliability when there has been a recent

(i) threat, or

(ii) overt act

(c) whether, assuming that a prediction of acceptable reliability is ordinarily impossible without such an act or threat, there are exceptional cases in which such a prediction can be made in the absence of such an act or threat (*e. g.,* a person who begins to behave in the same depressed and withdrawn manner he did prior to a suicide attempt some years earlier, but who has made no recent attempt or threat).

(d) questions (a), (b), and (c) when the condition to be determined is "inability to care for one's self." **

* Used herein as meaning the condition of a "person in need of mental treatment," who "is reasonably expected at the time the determination is being made or within a reasonable time thereafter to intentionally or unintentionally physically injure himself or other persons," as defined in Ill.Rev.Stat., ch. 91½, § 1–11 (1975).

** Used herein as meaning the condition of a "person in need of mental treatment" who is "unable to care for himself so as to guard himself from physical injury or to provide for his physical needs," as defined in the challenged statute.

3. Plaintiffs challenge as violative of due process the provision of the Illinois Mental Health Code of 1967, Ill.Rev.Stat. ch. 91½, §§ 1–1, et seq. (1975), which permits involuntary commitment of a person in need of mental treatment, who is defined as follows:

   . . . any person afflicted with a mental disorder, not including a person who is mentally retarded, as defined in this Act, if that person, as a result of such mental disorder, is reasonably expected at the time the determination is being made or within a reasonable time thereafter to intentionally or unintentionally physically injure himself or other persons, or is unable to care for himself so as to guard himself from physical injury or to provide for his own physical needs. This term does not include a person whose mental processes have merely been weakened or impaired by reason of advanced years.
   Ill.Rev.Stat. ch. 91½, 1–11 (1973).

4. The *Sansone* decision also stated that the state was required to prove the facts upon which commitment was based by clear and convincing evidence. More recently the Illinois Supreme Court has confirmed that this is the applicable standard. *In re Stephenson,* 67 Ill.2d 544, 10 Ill.Dec. 507, 367 N.E.2d 1273 (1977). Plaintiffs do not challenge the clear-and-convincing standard in this action. Compare *In re Stephenson, supra,* with *United States ex rel. Stachulak v. Couglin,* 520 F.2d 931 (7th Cir. 1975).

5. During the course of this proceeding plaintiffs have defined "recent" as meaning within the past year. In their most recent brief they suggest that we not set "an absolute time limit" but "merely employ the term 'recent' and indicate that the term would not encompass acts which occur at a point where the lapse of time has been so great that the probative value of the prior conduct has substantially diminished."

The term "overt act" is defined by plaintiffs for purposes of this proceeding as follows:

(1) An act or an omission which physically injures the actor or another, or which constitutes a failure to care for one's self so as to guard against physical injury or provide for one's own physical needs;

(2) an attempt to commit such an act or omission, or

the absence of such a requirement that in plaintiffs' view makes the statute unconstitutional.

Plaintiffs ask us to find that the reasonable expectation of injury described in the statute (to which we sometimes refer, for convenience, as "dangerousness," despite the general antipathy toward that term among the experts) cannot be determined in the absence of a recent overt act, and to hold that therefore civil commitment when there has not been such an act violates due process. We cannot make the requested finding.

The evidence relied on by plaintiffs in support of their position indicates that there is a high degree of error in predicting dangerousness, regardless of whether the subjects are mentally ill and regardless of whether the patient's history includes a recent overt act.[6] Plaintiffs, in view of their position as to the predictive or diagnostic capacity of psychiatrists, might be expected to argue that no commitment based on dangerousness is permissible, but they do not go so far. They limit their attack to the absence of an overt act requirement, and the issue before us is therefore a narrow one.

The learned articles to which plaintiffs refer us,[7] and plaintiffs' expert witnesses as well, rely heavily on a number of statistical studies, the shortcomings of which were pointed out in expert testimony offered by the defendants: the studies used as a measure only subsequent violent acts that resulted in legal proceedings; they did not take into account any treatment the subjects may have received prior to release; most used sample populations comprised of persons convicted of crimes, many of whom were not mentally ill.

No study has attempted to measure the extent to which the predictability of dangerousness is enhanced by a history of a recent overt act. (See note 6, *supra.*) There has of course been no study based on sample populations of mentally ill persons who have not been confined despite a finding of dangerousness. No study called to our attention attempts to measure the incidence of violent behavior in a sample population of persons civilly committed for dangerousness; and in any event the failure of a person actually to harm himself or another after a finding of dangerousness has led to his civil commitment to prevent such a result would not mean that he was not "reasonably likely" to do so had the commitment not occurred. Hence the limited value of statistical studies in this area. As Dr. Irwin N. Perr, an expert called by the defendants, testified in referring to the testimony given by plaintiffs' experts,

> [T]he discussion this morning has dealt with statistics but has lost sight of people and what you really deal with clinically.

Dr. Perr and the other expert called by defendants, Robert L. Sadoff, were practicing psychiatrists and teachers, Dr. Perr be-

---

(3) a threat to commit such an act or omission.

6. As defendants' expert Dr. Robert L. Sadoff testified

> the studies uniformly criticize the ability of psychiatrists to predict dangerousness and they did not differentiate whether that low predictability was based on prior act or not. [Tr. 132.] As a recent law review note points out, no study has attempted to determine the extent to which a recent overt act requirement would reduce the incidents of incorrect predictions of dangerousness. Note, *Overt Dangerous Behavior as a Constitutional Requirement for Involuntary Commitment of the Mentally Ill,* 44 U.Chi.L.Rev. 562, 584 (1977).

7. Representative studies can be found documented in Cocozza & Steadman, *The Failure of Psychiatric Predictions of Dangerousness: Clear and Convincing Evidence,* 29 Rutgers L.Rev. 1084 (1976); Steadman, *Some Evidence on the Inadequacy of the Concept and Determination of Dangerousness in Law and Psychiatry,* 1 J. Psychiatry and Law 409 (1973); Rubin, *Prediction of Dangerousness in Mentally Ill Criminals,* 27 Archives of Gen'l Psychiatry 397 (1972); Wenk, *et al., Can Violence be Predicted?,* 18 Crime & Delinquency 393 (1972). Among the articles referring to the studies are Albers, *et al., Involuntary Hospitalization and Psychiatric Testimony: The Falibility of the Doctrine of Immaculate Perception,* 6 Cap.L. Rev. 11 (1976); Ennis and Litwack, *Psychiatry and the Presumption of Expertise: Flipping Coins in the Courtroom,* 62 Cal.L.Rev. 693 (1974); von Hirsch, *Prediction of Criminal Conduct and Preventive Confinement of Convicted Persons,* 21 Buff.L.Rev. 717 (1972).

ing a Professor of Psychiatry at Rutgers Medical School and Dr. Sadoff an Associate Professor of Clinical Psychiatry at the University of Pennsylvania. Both had had extensive experience in forensic psychiatry and both were members of a task force of the American Psychiatric Association working on the problem of involuntary hospitalization. Their qualifications were unimpeachable, and both were credible witnesses.

Both testified in substance that there are cases in which a psychiatrist can determine in a clinical examination that the subject is reasonably expected to injure himself or another within a reasonable time after the examination is made, even though there is no history of an overt act, as defined for purposes of this case. Examples were given of instances in which such a diagnosis could be made in the absence of a recent overt act. According to Dr. Perr, these instances are not "insignificant" by which, we take it, he meant not insignificant in number. The testimony indicated that these views were held by most psychiatrists. Thus Dr. Perr testified,

> I think that the opinions that I have expressed in this matter would reflect the vast majority, or at least 90 per cent of psychiatrists on this matter. I think I would represent the general view.[8]

From the evidence, we find that there are instances in which a psychiatrist can determine from a psychiatric clinical examination that a mentally ill person is reasonably likely to injure himself or another even though the person's history does not include a recent overt act, as defined for purposes of this proceeding. (See note 5, *supra*.) These cases may be relatively few, but they are not so insignificant that they can be discarded in our evaluation. If we were to adopt plaintiffs' position, we would be holding that Illinois is powerless to protect the mentally ill person and society in these cases.[9] We are unwilling to reach such a conclusion even though in most cases a somewhat more reliable prediction can be made if there is a history of a recent overt act.

The weakness in plaintiffs' attack is that it is aimed at the statute, as interpreted, in the abstract rather than at an unlawful commitment in a particular case or an unlawful practice carried on by state officers. It may well be that in most cases the psychiatric determination necessary to support the finding of reasonable expectation that the statute requires could not be made in the absence of an overt act, just as it could not be made in the absence of other facts found in the patient's history or discovered in examining him. In those cases, the evidence will not justify a determination of dangerousness.

Implicit in plaintiffs' constitutional theory is the assumption that many commitments are made without sufficient evidence of dangerousness. If this is true, the remedy lies in the protection of the individual's right in each commitment proceeding, or a challenge to a pervasive practice of state officers if one exists, not in striking down the statute.

In considering how conclusive the showing of risk must be in order to satisfy the due process requirement in civil commitments of the mentally ill, the nature and purpose of such a commitment is relevant. The person committed, by definition, lacks the capacity to exercise his own volition in favor of or against commitment. The issue

---

8. Dr. Perr went on to say,

I have been quite active in the field of psychiatry. I have been on various national committees and a national officer. These things come up before the National Board. I have been on the board of trustees of the American Psychiatric Association for two years. I have been active in the American Academy of Psychiatry and the Law. We discuss these issues. I lectured a great deal around the country at medical schools, to psychiatric societies. I think what I have expressed here is what psychiatrists in the United States believe and practice.

9. It may be that only a psychiatrist can make such a determination, and that the evidence of a physician without psychiatric training would be insufficient, but plaintiffs' evidence is not addressed to that issue.

is whether to commit him temporarily [10] for treatment and, not only in society's interest but in his own interest, to protect against physical injury to himself or others while he is unable himself to exercise the necessary judgment to protect himself.

Plaintiffs also argue, alternatively, that without an overt act requirement the statute is unconstitutionally vague. We find no basis for this argument in the Supreme Court decisions cited by plaintiffs, *Papachristou v. City of Jacksonville*, 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972); *Giaccio v. Pennsylvania*, 382 U.S. 399, 86 S.Ct. 518, 15 L.Ed.2d 447 (1966); and *Louisiana v. United States*, 380 U.S. 145, 85 S.Ct. 817, 13 L.Ed.2d 709 (1965). The statute does not give the trier of fact an unstructured discretion to commit the mentally ill person. It requires a specific finding [11] by the trier of fact that the person is expected, at the time of the determination or within a reasonable time thereafter, intentionally to inflict physical injury on himself or another person. This standard is as precise as the circumstances permit and, in our opinion, satisfies due process. The legislature was not required to attempt to detail the evidence that would be required to support the finding. Even with respect to a criminal statute, that is unnecessary.

We have considered the opinions of the district courts that have viewed an overt act requirement as constitutionally required. *Lessard v. Schmidt*, 349 F.Supp. 1078 (E.D.Wis.1972) (three-judge court), *vacated on other grounds*, 414 U.S. 433, 94 S.Ct. 713, 38 L.Ed.2d 661 (1974), *on remand*, 379 F.Supp. 1376 (1974), *vacated on other grounds*, 421 U.S. 957, 95 S.Ct. 1943, 44 L.Ed.2d 445 (1975), *on remand* 413 F.Supp. 1318 (1976) (reinstating prior judgment); *Stamus v. Leonhardt*, 414 F.Supp. 439, 451 (S.D.Iowa 1976); *Doremus v. Farrell*, 407 F.Supp. 509, 514–515 (D.Neb.1975) (three-

judge court); *Lynch v. Baxley*, 386 F.Supp. 378, 391 (M.D.Ala.1974) (three-judge court); *Suzuki v. Quisenberry*, 411 F.Supp. 1113 (D.Haw.1977). In none of these cases, so far as can be determined from the opinions, did the court have before it expert evidence of the kind received in this case.

The problem of inability to care for one's self has been largely ignored in the offers of evidence. We should think that in most, if not all, cases in which commitment is sought on this ground, evidence of some prior act or omission which demonstrates the alleged inability will be necessary, but in the absence of evidence we cannot make a finding to that effect. The *Sansone* decision was addressed to the problem of reasonable expectation of injury to one's self or another rather than inability to care for one's self, and the clause of the statute allowing commitment on the latter ground appears not to have been authoritatively interpreted. We do not know whether this clause is currently being interpreted by Illinois commitment courts as requiring a previous history of recent inability to care for one's self or whether commitments are being made without such a history. Under the foregoing circumstances we cannot determine the clause to be unconstitutional.

Judgment will be entered in favor of defendants.

McMILLEN, District Judge, concurring.

Although I concur in the merits of the foregoing decision, I feel it appropriate to add a few comments of my own, particularly since I dissented in the decision by this same three-judge court on August 18, 1975.

A review of the evidence, taken both at the hearing on September 28, 1977 and in the agreed record when we entered our decision of August 18, 1975, convinces me

---

10. The average length of civil commitment in Illinois is four weeks. The temporary nature of the commitment and the safeguards assuring frequent review of the committed person's status are summarized by the Illinois Supreme Court in *In re Stephenson, supra*, note 3, 67 Ill.2d at 550–553, 367 N.E.2d at 1274–1276.

11. As we said earlier, see note 4, *supra*, the clear and convincing standard of proof is not challenged by plaintiffs. We therefore express no opinion upon it.

that the plaintiffs have misapprehended their remedy. They seek to declare the pertinent provision of the Illinois Mental Health Code unconstitutional on the ground that it does not contain a requirement that dangerousness be proved by a recent overt act or statement. In short, plaintiffs seek to have this element of proof inserted into the Illinois statute by judicial amendment. As Judge Tone points out above, however, the remedy must properly be pursued on a case-by-case basis by individuals who seek a review of their incarceration on specific constitutional grounds.

The expert witnesses agree that dangerousness cannot be accurately predicted either on the basis of recent overt acts or by psychiatric evaluation. The evidence shows that certain types of psychotic individuals can be dangerous without any prior history of overt acts, and others with such prior history are not predictably dangerous. Therefore, the criteria selected by the plaintiffs are not medically reliable and are not as dependable or precise as the statute itself. Since the profession of psychiatry has not been able to devise a method of reliably predicting dangerousness, neither the plaintiffs nor the courts have been able to find a formula which will fill this existing void. This does not render § 1–11 invalid, however.

A substantial constitutional question could be raised concerning whether any statute providing for involuntary commitment of deranged persons is valid unless it affords the same safeguards for personal liberty as in criminal cases. If a person has committed an overt act in Illinois sufficiently dangerous to constitute a crime, but is found not guilty by reason of insanity, then he can be incarcerated for treatment for the same period of time as though he had been found guilty. *Ill.Rev.Stat.,* Ch. 38, § 1005–2–4, as amended by P.A. 80–164 (1977). On the other hand, if he has not committed a crime and does not want to be deprived of his liberty, it is difficult to comprehend exactly what public need is being served by incarcerating him except the *parens patriae* objective of doing something for his own good.

Whether or not this laudable objective overcomes an individual's right to liberty is highly questionable, in my mind. It is not the objective of § 1–11 of the Illinois Mental Health Code which attempts to balance the interest of the general public against the individual's right to freedom. The Special Joint Committee on Revision of the Mental Health Code is now considering a revision of § 1–11 which will specifically require proof of a recent overt act or significant threat before involuntary commitment is permitted, but this is quite different from invalidating the present section because of the absence of such requirement.

The foregoing perhaps leads to the conclusion that deranged persons should be confined against their wills only on the same grounds as other persons, specifically criminals. This may also lead to the requirement that previous dangerous acts must be proven beyond a reasonable doubt, with all of the other due process safeguards afforded to a person charged with a crime. This extreme departure from the stipulated issue remaining in this case has not been presented by either party, and therefore we are not called upon to decide it. I advert to it merely because the evidence indicates that this may be the alternative before the final solution is found to the problem of involuntary commitment without conviction for a crime. Cf. *In re Stephenson,* 67 Ill.2d 544, 10 Ill.Dec. 507, 367 N.E.2d 1273 (1977).