James COLYAR, Individually and on behalf of all others similarly situated, Plaintiffs,

v.

The THIRD JUDICIAL DISTRICT COURT FOR SALT LAKE COUNTY, Defendant.

No. C 77–0314.

United States District Court, D. Utah, C. D.

Feb. 16, 1979.

Lucy Billings, Utah Legal Services, Inc., Salt Lake City, Utah, for plaintiffs.

Robert B. Hansen, Atty. Gen., Paul M. Tinker, Asst. Atty. Gen., Salt Lake City, Utah, for defendant.

Kathryn Collard, Salt Lake City, Utah, for amicus curiae American Civil Liberties Union.

## ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

ALDON J. ANDERSON, Chief Judge.

This lawsuit calls into question the Utah statute that provides for civil commitment of the mentally ill. In pertinent part, *Utah Code Annotated* § 64–7–36(6) (1953) provides that an individual may be involuntarily committed to treatment in a mental hospital or mental health facility by a proper district court of the State of Utah upon a finding by the court that, beyond a reasonable doubt, the proposed patient "(a) [i]s mentally ill, *and*" *either* (b) "[b]ecause of the patient's illness there is an immediate danger that the proposed patient will injure himself, herself or others if allowed to remain at liberty," *or* (c) the proposed patient "[i]s in need of custodial care or treatment in a mental health facility and, because of the patient's illness, either (i) lacks sufficient insight to make responsible decisions as to the need for care and treatment . . ." *or* "(ii) lacks sufficient capacity to provide himself or herself with the basic necessities of life." *Utah Code Ann.* § 64–7–36(6)(a) to (c) (1953). The statute also requires the court to find beyond a reasonable doubt that "[t]here is no appropriate less restrictive alternative to a court order of hospitalization . . ." and that the facility in which the individual is to be hospitalized "can provide the individual with treatment that is adequate and appropriate to the individual's conditions and needs." *Id.* § 64–7–36(6)(d).

■ The present action is brought pursuant to 42 U.S.C. § 1983, and, thus, jurisdiction is conferred upon this court by 28 U.S.C. § 1343(3). Defendant does not dispute the court's jurisdiction, but it contends that this court should abstain from exercising jurisdiction in this matter on the ground that "[t]his action involves substantive issues of state law which the state courts have not had the opportunity to examine." *Answer to Verified Complaint* at 1. The court concludes, however, that the present action is not an action in which the abstention doctrine may be properly invoked. It must be kept in mind that:

> Abstention from the exercise of federal jurisdiction is the exception, not the rule. "The doctrine of abstention, under which a District Court may decline to exercise or postpone the exercise of its jurisdiction, is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it. . . ."

*Colorado River Water Cons. Dist. v. United States,* 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976). The court has considered the three generally recognized types or categories of abstention doctrines (*see, id.* at 813–17, 96 S.Ct. 1236) and feels that there is no doctrine that would compel this court to refrain from exercising its jurisdiction in this matter. The court has jurisdiction over the subject matter and the parties now before it, and there appears to be no overriding state interest that would be furthered by this court's stepping aside and declining to rule on the clear constitutional question presented. Thus, the court will proceed to a consideration of the instant action on its merits.

According to the uncontested facts set forth in the complaint, plaintiff James Colyar is a twenty-five-year-old resident of Salt Lake City, Utah, who was involuntarily committed to the Utah State Hospital under the authority of the statute challenged herein, *Utah Code Ann.* § 64–7–36(6) (1953). Plaintiff Colyar "has shown no dangerous behavior, and his recent hospital history is marked only by religious delusions and a preference to resort to medications only after attempting to overcome his problems without them." *Verified Complaint* at ¶ 14. "On July 14, 1977, two physicians examined plaintiff for thirty minutes, and on July 15, 1977, they testified before defendant that plaintiff was mentally ill and lacked sufficient insight into his need for care." *Id.* at ¶ 15. The physicians diagnosed plaintiff as a paranoid schizophrenic and found plaintiff's "preference to try to overcome his

problems without medications to be a denial of his illness." *Id.* Upon the testimony of the two physicians and plaintiff's mother (who, incidentally, was the person who initiated the commitment procedure against plaintiff), the defendant court issued its order of involuntary hospitalization. *Id.* at ¶ 16. The state court specifically found that plaintiff was not an immediate danger to himself or others and that he did not lack sufficient capacity to provide himself with the basic necessities of life.

Subsequent to his commitment, plaintiff brought this class action suit alleging that *Utah Code Ann.* § 64–7–36(6)(c) is unconstitutionally vague and overbroad and therefore denies plaintiff and his class due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution. Plaintiff asks that § 64–7–36(6)(c) be declared invalid and that a permanent injunction be entered enjoining defendant from enforcing and executing said provision. Plaintiff further asks for attorneys fees and costs.

The class sought to be represented by plaintiff consists of "all persons involuntarily committed to a mental health facility upon the order of the Third Judicial District Court for Salt Lake County, despite the Court's findings that they were not an immediate danger to themselves or others if allowed to remain at liberty." *Plaintiff's Memorandum in Support of Motion for Class Action* at 2. Plaintiff and defendant stipulated to the cause proceeding as a class action with the class membership as defined above, and it was so ordered by the court. See *Order* entered November 12, 1977.

Both parties have moved for summary judgment, the motions have been argued to the court, memoranda from both the parties and amicus curiae have been submitted.[1] The court has carefully reviewed all argu-

ments placed before it and is ready to rule on the matter.

## I. *Plaintiff's Position*

Plaintiff first argues that the definition of "mentally ill" as provided in § 64–7–28(1) is unconstitutionally vague because it does not require a finding that the proposed patient is a danger to himself or others as evidenced by a recent overt act.[2] While 64–7–36(6)(b) requires a finding of dangerousness, a person can be committed under the statutory scheme if found to be mentally ill and in need of care or treatment under § 64–7–36(6)(c). It is the combination of provisions 64–7–28(1) and 64–7–36(6)(c) that in part plaintiff argues renders the statute unconstitutionally vague.

The plaintiff further argues that the definition of "mentally ill" is unconstitutionally vague "because it encompasses any disease that impairs functioning." *Plaintiff's Memorandum in Support of Motion for Summary Judgment* at 4 (hereinafter cited as *Plaintiff's Memorandum*). Plaintiff maintains that a definition of this breadth both fails to give a person of ordinary intelligence fair warning as to the conduct that will deprive him of liberty and provides no safeguards against arbitrary application.

As to § 64–7–36(6)(c), plaintiff contends that it is vague and overly broad because it leaves the committing authority with complete discretion and fails to give adequate notice of proscribed conduct. Plaintiff maintains that the standard "in need of custodial care or treatment" is open to an impermissible variety of interpretations. Further, plaintiff maintains that the "lacks sufficient insight" clause adds no limitation to the standard because it precludes a recognition of a rational decision not to receive treatment and is itself subject to differing interpretations.[3]

---

1. Upon stipulation of the parties, the American Civil Liberties Union submitted an amicus brief.

2. Section 64 7 28(1) is incorporated by reference in § 64 7 36(6).

3. Amicus also argues that § 64–7–36(6)(b) is unconstitutionally vague because it does not require a finding of dangerousness as evidenced by a recent overt act. The court finds, however, that section (b) of the statute is not in issue in this lawsuit since it played no part in

## II. Defendant's Position

Defendant first asserts that plaintiff has no standing to challenge the definition of mental illness as provided in § 64–7–28(1). Since plaintiff did not dispute the fact that he and members of his class are mentally ill, the defendant argues that "[t]he sole basis for plaintiff's challenge to the constitutionality of § 64–7–28(1) is that it might possibly be applied in an unconstitutional fashion to unidentified persons not before the court." *Defendant's Memorandum in Opposition to Plaintiff's Motion for Summary Judgment and In Support of Defendant's Motion for Summary Judgment* at 11 (hereinafter cited as *Defendant's Memorandum*). To allow standing on this basis would be "inconsistent with established rules of constitutional adjudication." *Id.* The defendant argues that the sole question before the court is whether a mentally ill person can constitutionally be committed without a finding of dangerousness and, accordingly, plaintiff may not raise other issues in this proceeding.

The defendant next asserts that the doctrine of parens patriae permits a state to subject an individual to involuntary commitment even though that person is not a danger to himself or others. Defendant admits that the use of state power under parens patriae is not shielded from due process requirements and that the mere fact of mental illness does not justify commitment. *Id.* at 14. It argues, however, that under the Utah statute an individual can be committed only if he is both mentally ill, in need of care or treatment, *and* "cannot responsibly react voluntarily to his need for treatment." *Id.* at 14–15. According to the defendant, this commitment standard meets due process requirements.

Specifically addressing the vagueness issue, the defendant urges that the standards of notice applied in the criminal law context are inapplicable to the field of mental health. Within the criminal law, statutes must be sufficiently precise to give a person of ordinary intelligence notice of the conduct that is proscribed by the state. Defendant argues that since one cannot avoid becoming mentally ill simply by knowing the terms of the statute, the analogy to the criminal law breaks down and is invalid.

The second point made by defendant is that precise, exacting definitions are not possible in the field of mental health. To impose requirements for extreme precision would be useless and, perhaps, counterproductive.

Finally, defendant argues that because all elements of the statute must be proven beyond a reasonable doubt, commitment decisions cannot be arbitrary and capricious. In other words, the standard of proof required insures that, even if the statute is vague, it cannot be applied in an uneven manner.

As to the overbreadth issue, defendant attempts to distinguish the cases cited by plaintiff and argues that the state has a legitimate interest in regulating the behavior of mentally ill persons who are not dangerous to themselves or others. Defendant further argues that the "in need of care or treatment" standard may be interpreted as requiring a finding of dangerousness to self. Defendant's premise is that the condition of mental illness needing treatment, and inability to do anything about seeking or accepting treatment, poses an immediate danger to the individual. *Id.* at 25.

Finally, defendant argues that even if dangerousness is a legitimate requirement for commitment decisions, it need not be evidenced by a recent overt act. *United States ex rel. Mathew v. Nelson,* No. 72–c–2104 (N.D.Ill. August 18, 1975), *aff'd on reh.* 461 F.Supp. 707 (1978) is cited in support of this proposition.

## III. The Decision

### A. Standing to Challenge Section 64–7–28(1)

In order to resolve defendant's assertion that plaintiff lacks standing to challenge § 64–7–28(1), one must view plaintiff's ar-

---

the commitment of plaintiff nor members of the class. Therefore, the question of the validity of

§ 64 7 36(6)(b) is not properly before the court and is not ruled upon in this opinion.

gument in its entirety. In essence, plaintiff is saying that the state may not commit an individual solely on the finding that he or she is mentally ill, in need of care or treatment and lacking in sufficient insight to make a responsible treatment decision. It is plaintiff's assertion that, somewhere within the commitment criteria, there must be a requirement that the state show that the individual is dangerous to himself or others. Further, plaintiff challenges the legitimacy of § 64–7–28(1) on the ground that it is not defined with sufficient precision so as to avoid inconsistent and arbitrary application. If there is no requirement for a finding of dangerousness and/or a sufficiently precise definition of mental illness, then, plaintiff argues, the *statutory scheme* providing for involuntary commitment is unconstitutionally vague and overbroad both as applied and on its face. *Plaintiff's Memorandum* at 2. Plaintiff and members of his class were committed under this statutory scheme. If, as plaintiff alleges, the scheme violates his constitutional rights, then plaintiff has suffered a direct injury as a result of enforcement of the statute. Such injury is sufficient to confer standing.

■ Defendant's assertion that because plaintiff has not shown that he is not mentally ill he cannot attack the definition of mental illness has little substance. An important premise of plaintiff's argument is that the definition of mental illness is so vague as to work a denial of due process of law when used as a basis for commitment. If the statute is as plaintiff alleges it to be, it cannot be constitutionally applied to *anyone*—mentally ill or not. See *Papachristou v. City of Jacksonville*, 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972). In order to establish standing, plaintiff does not have to show that he is not within a definition that he alleges is not constitutionally valid. Cf. *Cramp v. Board of Public Instruction*, 368 U.S. 278, 283–85, 82 S.Ct. 275, 7 L.Ed.2d 285 (1961).

■ As to plaintiff's assertions regarding overbreadth, he clearly has standing. Here plaintiff is arguing that the statute is over-

ly broad because it permits the commitment of nondangerous individuals. Plaintiff was specifically found not to be a danger to himself or others. Thus, he is within that class of persons he alleges the statute cannot permissibly reach. Therefore, he has standing to raise the overbreadth issue in terms of the entire commitment scheme, including the definition of mental illness which is incorporated in § 64–7–36(6)(c).

### B. Use of the Parens Patriae Power to Commit an Individual Who is Not a Danger to Himself or Others

■ Under the parens patriae power a state may commit an individual to a mental hospital even though the individual poses no threat to society. *In Re Ballay*, 157 U.S. App.D.C. 59, 482 F.2d 648, 658–59 (1973). The doctrine of parens patriae was first recognized in the United States in *Matter of Josiah Oakes*, 8 Law Rep. 123 (Mass.1845) and is commonly justified on the basis of humanitarian motives regarding the mentally ill. *Lessard v. Schmidt*, 349 F.Supp. 1078, 1085 (E.D.Wis.1972). The power is "inherent in the supreme power of every state" *Mormon Church v. United States*, 136 U.S. 1, 57, 10 S.Ct. 792, 808, 34 L.Ed. 481 (1890) and can be construed as a power granted to the state by the people for their future protection. See, "Developments in the Law—Civil Commitment of the Mentally Ill," 87 *Harv.L.Rev.* 1190, 1208 (1974) (hereinafter cited as "Developments").

■ However, the humanitarian motivation of the state when acting under parens patriae does not shield the use of the power from due process requirements. *O'Connor v. Donaldson*, 422 U.S. 563, 580, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1976) (Burger, C. J., concurring); *Specht v. Patterson*, 386 U.S. 605, 608, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967). No matter how benign the state's purpose, it must be recognized that involuntary commitment represents a "massive curtailment of liberties" which, because it may be for an indeterminate period of time, can be a more intrusive use of the state's power than incarceration under the criminal code. *See, Humphrey v. Cady*, 405 U.S. 504,

509, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972). The involuntary mental patient's[4] freedom of movement is greatly restricted: he cannot leave the hospital without the permission of the staff and his movements within the hospital itself are often closely regulated. He may be denied the right to visit with family and friends while he is in the hospital setting. And he too often finds that, upon release, the stigma that attaches to a former "mental patient" results in his inability to find work and become reintegrated into the community. *Lessard v. Schmidt, supra* at 1089; "Developments," *supra* at 1192–1201. Thus, while the state may be acting with the individual's best interests in mind, it is also, in committing an individual to a mental hospital, depriving the person of his fundamental right to liberty. Further, this deprivation, if even for a short time, may have grave and lasting consequences for the rest of the person's life.

The state cannot work such a deprivation, as a matter of substantive due process, without first showing a compelling interest to justify its action. *Doremus v. Farrell*, 407 F.Supp. 509, 514 (D.Neb.1975); *Lessard v. Schmidt, supra* at 1090; cf. *Lynch v. Baxley*, 386 F.Supp. 378, 390 (M.D. Ala.1974). Therefore, in order to determine the validity of involuntary commitment under § 64–7–36(6)(c), the court must analyze the state interest involved and balance it against the substantial individual interest which is impaired by the state action.

### 1. The Individual Interest

The individual interest is clear: Every citizen has an interest in and the right to freedom of travel, association, and speech; in essence, an interest in and right to all the incidents of freedom "implicit in the concept of ordered liberty." *Palko v. Connecticut*, 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937). That this right is severely impinged when the state acts to involuntarily commit is obvious.

It might be argued that the individual interest is less fundamental or less important when one is dealing with a person of diminished capacity because the person lacks the ability to make meaningful choices. If the individual interest is less fundamental, then, the argument goes, the state's interest may be less compelling. But this argument sweeps too broadly. Whether an interest is fundamental depends not on the depth of individual appreciation of the interest at stake, but on whether or not the right is protected by the Constitution. *San Antonio Independent School Dist. v. Rodriguez*, 411 U.S. 1, 30–34, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973); "Developments," *supra* at 1211 n. 6. Further, diminished capacity or erratic behavior in some areas of an individual's life does not necessarily render that person incapable of appreciating and making rational choices. See *O'Connor v. Donaldson, supra* at 575, 95 S.Ct. 2486. Recognition of the fact that a "mentally ill" person may be perfectly capable of rational decision making has long been a part of the law of contracts and wills. "Developments," *supra* at 1214. There is no reason why the law should not recognize the possibility of rational choice when it is dealing with the deprivation of fundamental human rights. An individual's diminished capacity should not and does not affect the protection owed him when the state attempts to deprive him of his liberty.

### 2. The State's Interest

The state clearly has a legitimate interest in protecting its citizens from harm, whether the source of the harm is from other citizens or from the citizen himself. *O'Connor v. Donaldson, supra; In Re Ballay, supra*. An individual who cannot provide for himself the basic necessities of life (food, clothing, shelter) or who inflicts physical damage on himself, and who, because of a mental illness, cannot make a rational decision to receive treatment, does pose a threat to his own well-being. *In Re*

---

4. The court recognizes that the voluntary mental patient faces the same restrictions and stigma as the involuntarily committed. However, when an individual voluntarily seeks hospitalization or other therapeutic care the question of state intervention does not arise.

*Ballay, supra; Doremus v. Farrell, supra; Lynch v. Baxley, supra.* Such a person is a danger to himself *not primarily* because his illness prevents him from seeking treatment, but rather because his illness prevents him from taking basic care of himself *and* from engaging in any behavior (i.e., seeking treatment)[5] that would ameliorate his condition. The state, under the parens patriae power, has a legitimate interest in involuntarily committing such an individual.

▆ If an individual is able to provide basic care for himself and is not otherwise a danger to himself or others, the legitimacy of the state's interest is called into serious question. The parens patriae power is premised on the state's interest in caring for those who cannot care for themselves. If an individual can care for himself, alone or with the help of family or friends, the rationale behind the parens patriae power fails. As stated in *O'Connor v. Donaldson, supra* :

> May the State confine the mentally ill merely to ensure them a living standard superior to that which they enjoy in the private community? That the State has a proper interest in providing care and assistance to the unfortunate goes without saying. But the mere presence of mental illness does not disqualify a person from preferring his home to the comforts of an institution. Moreover, *while the State may arguably confine a person to save him from harm, incarceration is rarely a necessary condition for raising the living standard of those capable of surviving safely in freedom* . . . .
>
> . . . .
>
> In short, a State cannot constitutionally confine without more a nondangerous individual who is capable of surviving safely in freedom . . . .

*Id.* 422 U.S. at 575–6, 95 S.Ct. at 2493–2494. (emphasis added). Thus, an individual who is not a danger to himself cannot be involuntarily committed under the parens patriae power.

The defendant would argue that one who is found to be in need of treatment but who is unable to seek or voluntarily accept it because of his illness is a danger to himself, whether or not the individual can provide the basic physical necessities. *Defendant's Memorandum* at 25. The court has serious concerns about this argument and the breadth it would impart to a state's ability to commit. However, the issue raised need not be ruled on at this time. Here, plaintiff and members of his class were specifically found *not* to be a danger to themselves. Further, it is clear from the wording of the statute that inability to recognize the need for treatment is a criteria for commitment *separate and apart* from dangerousness. Thus, whatever the merits of defendant's position, it is not a position that is relevant within the framework of this lawsuit nor within the framework of the statute as presently written.

▆ Given that in order to be involuntarily committed a mentally-ill person must be shown to be a danger to himself or others, and that such danger may include the incapacity to provide the basic necessities of life, the court feels constrained to hold that the state must also show that the individual is incapable of making a rational choice regarding the acceptance of care or treatment. As stated, a finding of mental illness does not necessarily mean that an individual is deprived of all of his capacity to make rational decisions. Assuming that a rational decision can be made, "it is not difficult to see that the rational choice in many instances would be to forego treatment, particularly if it carries with it the

---

5. The use of the word "treatment" here should not be construed to preclude the possibility of an individual seeking custodial care. Nor should it be construed as implying that the state may commit only those for whom there is currently a proven efficacious treatment. It is unfortunate, but true, that at the present time there are many emotional disturbances that do

not lend themselves to treatment and cure. Therefore, for the purposes of this decision, the court assumes, without deciding, that a state may validly recognize this reality, and, given conformity to other due process requirements, may involuntarily commit an individual for custodial care, though no known treatment is available.

stigma of incarceration in a mental institution, with the difficulties of obtaining release, the curtailments of many rights, the interruption of job and family life, and the difficulties of attempting to obtain a job . . . upon release from the hospital." *Lessard v. Schmidt, supra* at 1094. If an individual can make a meaningful choice not to receive treatment, he must be allowed to make that choice. The state's interest in protecting him from harm does not outweigh the competent individual's right to make and carry out what is, perhaps, one of the most important decisions of his life. Cf. *Winters v. Miller,* 446 F.2d 65 (2d Cir.), *cert. denied* 404 U.S. 985, 92 S.Ct. 450, 30 L.Ed.2d 369 (1971); *Lynch v. Baxley, supra* at 391.

█ In summary, in order to commit an individual under the parens patriae power, consistent with the standards of substantive due process, the state must be required to show, under the facts here, that 1) the person is mentally ill; 2) that the person poses an immediate danger to himself, which may include the inability to provide the basic necessities of life, such as food, clothing, and shelter, and 3) that, because of his illness, the person is unable to make a rational decision as to the need for treatment.

### C. The Utah Statute

Given the above standard, one finds serious problems with the Utah statute. The portion of the statute in question allows for the commitment of an individual who is mentally ill, in need of treatment and who "lacks sufficient insight to make a *responsible* decision as to the need for care and treatment as demonstrated by evidence of unwillingness or inability to follow through with treatment . . ." *Utah Code Ann.* § 64–7–36(6)(c)(i) (1953) (emphasis added). Mental illness is defined as:

a psychosis or other disease which substantially impairs a person's emotional processes, thought, cognition, memory or functioning to such an extent that the person's own welfare or the welfare of others requires care and treatment of such person.

*Utah Code Ann.* § 64–7–28(1) (1953). Nowhere in this statutory language does one find a requirement that the state show that the individual poses a danger to himself or that the individual is incapable of making a rational treatment decision. While one might argue that the "person's own welfare" language of § 64–7–28(1) implies that the person must be shown to be a danger to himself, the court finds that the inference to be drawn from such language is too great. A person's welfare could easily include a concern for the individual's standard of living or for the individual's inability to conform to the behavior expected by the majority of society. The language used is too broad to insure that only when the individual poses a threat to himself of the kind that imperils his immediate physical well-being will he be committed. It is a far different thing to commit an individual who cannot function sufficiently to provide himself with food adequate to supply basic survival needs than it is to commit an individual who chooses to live under conditions that most of society would conclude to be substandard and a threat to the individual's *general* welfare.

One might argue, as defendant does, that the "lacking sufficient insight" clause of § 64–7–36(6) requires a showing of inability to make a rational treatment decision. The court finds, however, that the statute is too broadly drawn to insure that this is the only meaning which can be ascribed to the language. First, the language by its terms equates an inability to make a "responsible" decision with an unwillingness to follow through with treatment. This equation is both too broad and too vague for it allows a court to commit a "mentally ill" person on the sole basis of the person's unwillingness to accept treatment, without finding that the individual is incapable of making a rational choice as to whether he wants treatment or not. In fact, the choice not to accept treatment becomes, under the statute, a basis *in and of itself* for commitment.

Second, the statute refers to "*a responsible* decision." This standard is sufficiently

vague and overbroad to allow for a great deal of abuse. The use of the word "responsible" focuses the committing authority's attention on the *content* of the decision rather than on the ability of the individual to engage in a rational decision-making *process.* The word "responsible," being given no further content, lends itself to a completely subjective and, therefore, potentially arbitrary and nonuniform, evaluation of *what* is decided rather than an objective evaluation of the *method* by which the decision is reached. Thus, the statutory language does not preclude the possibility that an individual could be committed because a particular judge did not view his decision to forego, for example, electroshock therapy, as "responsible." See *Lynch v. Baxley, supra* at 391; "Developments," *supra* at 1216 and 1217 n. 87 & 90.

The defendant urges that any ambiguity in the statute is cured by the fact that the state must prove all the statutory elements beyond a reasonable doubt. This standard of proof is a stringent one, and does work to provide protection for the person facing involuntary commitment. The protection afforded is, however, from the risk of *factual* error, not from the risk of commitment under an overly broad or unduly vague statute. *In Re Ballay, supra* at 650. The statute does provide that a person not be committed unless the state shows beyond a reasonable doubt that he can be validly confined. However, the statute does not make sufficiently precise the criteria by which a state can validly commit. If it is not clear what has to be proven beyond a reasonable doubt, or if what must be proven is too broad in character, the *standard* of proof applied is irrelevant. No matter how high the standard, the due process problem of *what* must be proven remains.

The court finds, therefore, that to the extent that the Utah statute allows for the commitment of mentally ill individuals who are not a threat to themselves and/or who are able to make a rational decision as to treatment, it is both overly broad and impermissibly vague. The statute, as worded, sweeps within the state's power individuals whom the state has no valid parens patriae interest in committing and lends itself to arbitrary and capricious decisions. The court would prefer to construe the statute so as to avoid a determination of unconstitutionality, but finds that impossible, because of the way the statute is constructed. Section 64–7–36(6)(b) provides for commitment of a mentally ill person who presents an immediate danger to himself or others. Section (c) is manifestly intended to be an *alternative* to section (b). It is clear that the legislature intended that the basis for commitment under section (c) *not* include dangerousness to self. Further, neither section (b) nor section (c) nor any other part of the statute requires the state to prove that the proposed patient is incapable of making a rational treatment decision. It is thus impossible to "read into" the statute the elements necessary to make the statute meet due process requirements. Cf. *Lessard v. Schmidt, supra.*

Section 64–7–28(1) need not, however, be stricken. While conforming to the definition of mental illness is a prerequisite to commitment, a finding of mental illness alone will not result in the commitment of anyone. Therefore, this part of the statute need not carry the full burden of meeting all constitutional requirements. Section 64–7–28(1) must be read in conjunction with § 64–7–36(6) and to the extent that the latter section requires a finding of dangerousness and inability to make a rational treatment decision, the statutory scheme is valid. Further, if § 64–7–28(1) were voided the entire commitment statute would have to be struck down, since a finding of mental illness must be made before any commitment can take place under either section 64–7–36(6)(b) or (c). As stated previously, section (6)(b) is not in issue in this case and the court is not inclined to rule on its validity indirectly as that section of the statute involves issues of commitment under the state's police power as well as under parens patriae.

Finally, the court is not convinced by plaintiff's argument that the definition of mental illness under § 64–7–28(1) is im-

permissibly vague and that it allows for a finding of mental illness based on a purely physical disease that impairs functioning. The section must be taken in context. It is a part of the statute defining commitment procedures for the mentally ill. When read in that context, it is clear that § 64–7–28(1) was not drafted with the intent of allowing for the commitment of the physically ill. Further, as plaintiff very ably points out in other parts of his brief, the field of mental health is not one that lends itself to extremely precise definitions. To require a degree of precision that the current science cannot afford would be futile. Finally, when § 64–7–28(1) is read in conjunction with § 64–7–36(6) (assuming the deficiencies in the latter section are corrected) the statutory scheme meets the requirements of due process.

In summary, the court finds that a statute authorizing the involuntary commitment of the mentally ill under the parens patriae power must reflect the following considerations: The committing authority must find, as a threshold requirement, that the proposed patient is incapable of making a rational treatment decision. The purpose of this requirement is to require the committing court to "distinguish between those persons whose decisions to refuse treatment must be accepted as final from those whose choices may be validly overridden through parens patriae commitment." "Developments", *supra* at 1216. The statutory language employed to give effect to this criteria must, then, focus on the individual's ability to engage in a decision-making *process*; his ability to weigh the costs and benefits of commitment or treatment. The statute must leave room for the individual who would rather remain free of therapeutic intervention even though that freedom is obtained at the price of diminished functional capacity. Thus, prior to committing a person, the court must find that the proposed patient is unable to assess the possible benefits of treatment and to understand the hazards and risks to health involved in his decision to forego treatment. (It should, of course, medically appear that there are such risks.) Whatever language is used, the statute should not focus primarily on the content of the decision, but should focus on the decision-making process.

If an individual is found to be incapable of making a rational treatment decision, then the committing authority must, in addition, find that the individual is a danger to himself and in need of care and treatment. Such a finding may rest on the fact that the individual's mental condition poses an immediate threat to his physical well-being; i.e., that he is in immediate danger of taking his own life or otherwise injuring himself physically, or that there is an immediate risk of serious harm resulting to him if not treated promptly; or that he cannot function well enough to provide himself with the basic necessities of life, such as food, clothing, and shelter. See *Lynch v. Baxley, supra* at 391. If these elements are found in the appropriate combination, as required by the statute, then the court may validly proceed, under the parens patriae power, to commit.

The court does not find that due process requires that the above elements be evidenced by a recent overt act. While it is true that many courts have required that commitment statutes include this criterion, the court is not convinced that, in reality, such criterion adds any substantial protection that is not already set out above. See *United States ex rel. Mathews v. Nelson, supra.* The premise of the argument supporting the "recent overt act" requirement appears to be that such a requirement insures that the state will have to put on sufficient evidence to show that a proposed patient is in fact a danger to himself and not just living a life style that does not conform to societal expectations. Supporting this position, plaintiff cites numerous articles outlining the inherent subjectivity of psychiatric evaluations and the inability of mental health professionals to accurately predict when an individual poses a danger to himself. The court may well agree that the science of psychiatry is at times imprecise and subjective. However, it is not clear that the addition of the "recent overt

act" requirement does much to correct this situation. As pointed out in the *Nelson* decision, there is no scientific evidence that the requirement decreases the chance of error in predicting dangerousness. Given the showing in this case, the court is not prepared to rule that such a criteria must be established. The more appropriate forum for resolution of this issue is in the legislature itself where, in the exercise of its sovereign powers, it can make a full exploration of the utility of the recent overt act requirement.

*IV. The Remedy*

■ Plaintiff has asked for both injunctive and declaratory relief. The injunction prayed for is to prevent the defendant, the Third District Court, from enforcing section 64–7–36(6)(c) against plaintiff and members of his class. The court denies the request for injunction for two reasons.

First, it is not an appropriate remedy for the class of plaintiffs before the court. These individuals have already been committed under section 64–7–36(6)(c). There are no further proceedings pending against them. There is no reason to believe that if a member of the class were released from the state hospital that he would be in danger of renewed commitment efforts under the portion of the Utah Code at issue here. In other words, the class of individuals before the court is not threatened with any harm from the implementation of the statute. The damage as to these individuals has already been done and there is no further threat, that is not entirely hypothetical, to protect these people against. Thus, an injunction against the commitment of individuals under the authority of section 64–7–36(6)(c) would not benefit the parties before the court.

Second, the court sees no need at the present time to invoke so extreme a remedy against its state court colleagues. As stated by Justice Friendly:

Considerations of comity to respected fellow-judges [and members of the state legislature] suggest that they should be afforded a reasonable opportunity to re-flect on our conclusions and perhaps take action that may obviate any occasion for an injunction.

*Law Students Civil Rights Research Council v. Wadmond,* 299 F.Supp. 117, 133 (S.D.N.Y. 1969), *aff'd* 401 U.S. 154, 91 S.Ct. 720, 27 L.Ed.2d 749 (1971). See also, *Nicholson v. Board of Commissioners of the Alabama State Bar Ass'n.,* 338 F.Supp. 48, 57 (M.D. Ala.1972). The court is convinced that members of the state judiciary and legislature will respond to today's opinion, with appropriate remedial measures, without further intrusion by the federal courts.

■ The request for declaratory relief presents some difficult, but not insurmountable, problems. 28 U.S.C. § 2201 provides in pertinent part:

[i]n a case of actual controversy . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. . . .

In order to assume jurisdiction of the cause and to grant relief under section 2201, the court must have before it an "actual" controversy. The controversy must be "appropriate for judicial determination"; i.e., it must be susceptible to "specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Aetna Life Insurance Co. v. Haworth,* 300 U.S. 227, 240–41, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937). In short, there must be sufficient adverseness between the litigants to satisfy the case and controversy requirement of Article III of the U.S. Constitution.

There is not a bright line test for determining when such adverseness exists.

The difference between an abstract question and a "controversy" contemplated by the Declaratory Judgment Act is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy. Basically, the question in each case is whether the facts alleged, under

all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. *Maryland Casualty Company v. Pacific Oil and Coal Company*, 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941). Here the parties' interests appear to be sufficiently adverse to warrant the declaratory remedy. The class members certainly have a very real and immediate interest in the circumstances under which they were involuntarily committed. Further, the class members' interest in not being committed under § 64–7–36(6)(c) is distinctly adverse to the defendant's interest in implementing that part of the statute and in having its decision upheld. Thus, there is a sufficient degree of adversity between the parties to assure that the case will be properly litigated, that a real, as opposed to hypothetical, controversy exists, and that there is jurisdiction under the requirements of Article III.

There are, however, aspects of this case that might argue for the court's exercise of discretion in refusing to grant declaratory relief. The principal problem in this regard is that a declaration of unconstitutionality might appear to do no more than advise on what the law is. That is, such a declaration provides no immediate relief to the class before the court. The class members remain in the custody of the state hospital. Further, since the class is composed only of those individuals involuntarily committed by the Third District Court, there remain a great many individuals, committed by other courts, whose rights are not resolved by this decision. Under these circumstances, it might be argued that the court should exercise its discretion and refuse declaratory relief until such time as a case is presented which asks for more definitive relief for a broader class of plaintiffs against a broader class of defendants.

The court is not, however, convinced by this argument. The two principal criteria used to determine whether to grant declaratory relief are 1) whether the judg-ment will serve a useful purpose in clarifying and settling the legal relations in issue; and 2) whether the judgment will terminate and afford relief from the uncertainty, insecurity and controversy. 6A J. Moore, Federal Practice ¶ 57.08[1] at 57–35 (2d ed. 1974). This decision declares that the commitment of an individual under section 64–7–36(6)(c) of the Utah Code violates due process of law. The declaration settles any uncertainty or insecurity about the validity of the statute and any future attempts to commit under its authority. Further, such a declaration allows the parties to this action to deal with each class member's particular situation in determining the appropriate future course for each individual. *Alsager v. District Court*, 518 F.2d 1160, 1165 (8th Cir. 1975). It may be that individual class members or others similarly situated could apply for a new hearing to determine the validity of their continued confinement. The declaration of rights made herein may assist in clarifying the basis for reviewing the individual case to determine whether continued confinement is constitutionally permissible or whether the individual must be released. While it is true that some further litigation or other judicial proceeding may be necessary to finally determine each class member's status and the status of similarly situated individuals who are not members of the class, this *is not a sufficient reason to refuse declara-tory relief*.

It is not necessary that the *broader controversy* be settled—not necessary that all of the manifold and multifarious issues and legal relationships and interrelationships of the *entire* dispute be put at rest by the declaratory remedy.

6A J. Moore, *supra* at 57 46 (emphasis in original). See also, *Dunleer Co. v. Minter Homes Corp.*, 33 F.Supp. 242, 244 (S.D.W. Va.1940). There is a sufficiently useful purpose in declaring the rights of these parties to afford a basis for relief.

The court is also aware that there are courts in the state that, although not parties to this action, will be affected by this decision. However, under the provisions of

§ 64–7–36 the courts, as committing authorities, act as agents of the state government. Given that the state Attorney General defended this suit, the court finds that the state's and the courts' interests were represented. Accordingly,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that *Utah Code Ann.* § 64–7–36(6)(c) is invalid as violative of the due process clause of the Fourteenth Amendment to the United States Constitution.

Parties to pay their own costs.