679 A.2d 1174

IN THE MATTER OF THE COMMITMENT OF N.N., APPELLANT.

Argued January 16, 1996—Decided August 5, 1996.

*Theodore S. Novak*, Managing Attorney, argued the cause for appellant (*Susan L. Reisner*, Public Defender, attorney; *Mr. Novak* and *Stanley M. Shur*, Staff Attorney, on the brief).

*Daisy B. Barreto*, Deputy Attorney General, argued the cause for respondent, Attorney General of New Jersey (*Deborah T. Poritz*, Attorney General, attorney; *Joseph L. Yannotti*, Assistant Attorney General, of counsel).

The opinion of the Court was delivered by

HANDLER, J.

In this case, a fifteen-year-old girl was involuntarily committed to a psychiatric hospital because of conduct problems including an assaultive episode with another youth. She initially entered a psychiatric hospital for a seven-day examination. The examining

psychiatrist attributed her condition to a mood imbalance amounting to a type of mental illness, and recommended a continued commitment. The court reviewing her commitment found that she did not present a threat of danger to herself or to others.

The Court's rule, under which the girl was committed, provides that a minor may be involuntarily committed if a court finds that the minor is in need of therapy that cannot be provided anywhere but in a psychiatric hospital. The issue in this case is whether the standard governing the involuntary commitment of minors, which does not require that the minor suffer from a mental illness that poses a danger to self or others, is unconstitutional.

I

In November of 1994, N.N., a fifteen-year-old, was arrested after an altercation in which she allegedly assaulted another youth with a box cutter. N.N. claimed that she was being harassed by the other youths, and stated that she acted in self-defense.

N.N. was charged with juvenile delinquency and spent approximately one month at the Atlantic County Detention Center (hereinafter "Harborfields"). On December 6, 1994, N.N. signed a request for voluntary admission to the Bridgeton Hospital because the judge in the juvenile proceeding wanted her to have a seven-day evaluation. The court did not issue a detainer requiring her presence at Bridgeton nor mandating her return to Harborfields after the seven-day examination.

N.N. had previously received psychiatric therapy during a month-long inpatient stay at the Child Guidance Clinic in Philadelphia in June and July of 1993. There are no records of her diagnosis from this clinic, although it is asserted that this treatment was due to N.N.'s "depression and poor impulse control." N.N. also had problems at school. She was expelled from Catholic school for yelling at a nun; she repeated the ninth grade, due to "family problems," and attended an alternative school for a time.

Apparently, N.N. did not exhibit any behavioral incidents or problems while at Bridgeton Hospital. No psychiatric medication was prescribed for her prior to her admission to Bridgeton

Hospital, and none was administered during her seven days in the hospital.

N.N. believed that she would be returning home with her mother after the seven-day evaluation, and would subsequently attend a partial care program. The hospital's family therapist had made arrangements for outpatient referrals and follow-up care for N.N. following her discharge. However, when N.N. was told that her psychiatrist at the hospital, Dr. Williams, recommended that she stay at least another week, N.N. became tearful, started to curse, slammed the door and kicked a water fountain. However, N.N. did not hit or threaten anyone during this episode.

At a hearing reviewing the voluntary admission, the examining psychiatrist, Dr. Williams, noted that N.N. had requested to go home, thereby revoking her voluntary status under statutory and regulatory standards. *N.J.S.A.* 30:4–27.20; *R.* 4:74–7(k). Dr. Williams testified that he would attempt to obtain a temporary order for involuntary commitment, and a hearing for involuntary commitment was scheduled in the Superior Court, Law Division, Gloucester County. The trial court then conducted a hearing to determine whether N.N. should be involuntarily committed. N.N. testified that the episode lasted less than five minutes, and that she calmed down as soon as she was told to calm down. The doctor offered her medication to quiet her, but N.N. refused. The patient progress notes for that night indicate that N.N. was "placed in the quiet room for her own protection," but that she "was able to calm down and come out of the quiet room" and there were "[n]o suicidal tendencies noted" for that night.

Dr. Williams regarded this outburst not as an episode caused by the stress of being told to remain in the hospital, but rather as the product of a mental illness that he diagnosed as a "conduct disorder" and post-traumatic stress disorder. Dr. Williams described this as a disturbance of mood, but not as a disturbance of thought, perception or orientation. The diagnosis of post-traumatic stress disorder related to an incident that N.N. recounted in her therapy session with Dr. Williams, in which N.N. was "gang-raped" by a group of five adolescents when she was eight years old. The doctor noted that N.N. "faulted herself for the rape" and

kept this to herself until she was admitted to the Child Guidance Clinic program.

Generally, Dr. Williams felt that N.N. had poor impulse control and was "volatile" in the sense of having a "labile affect": she could be "very changeable, rather whimsical, based on something [internal] irregardless [sic] of what you might expect from the environment." The doctor conceded that he did not mean "volatile" in the sense of "out of control." The doctor believed that N.N. suffered from a "substantial disturbance of mood perception," which would have qualified her for commitment under the adult standard of mental illness.

Dr. Williams also felt that N.N.'s symptoms were not more severe only because she was in a protected environment. He expressed concern that N.N. would injure herself or another person if she were not receiving inpatient care. He stated that if stressed, "she will fall apart and lose her judgment; and, as long as she is not stressed and her needs are met, she can be quite cooperative." The doctor reported that if N.N. were involuntarily committed, she could receive individual and group therapy in a secure, locked-ward environment, "within ... total control and authority."

The doctor felt justified in seeking involuntary commitment, because in his opinion N.N. met both the "dangerousness" standard and the alternative "in need of intensive psychiatric therapy" standard necessary for involuntary commitment. The doctor stated that he would pursue involuntary commitment even if N.N.'s mother were to object to her continued institutionalization.

The trial court found that N.N. had a "disturbance of mood" evidenced by her behavior the night before the hearing. The court noted that the psychiatrist had characterized this behavior as being "out-of-control." However, the court declined to find that N.N. could be committed under the "dangerousness" standard. Instead, the court found that N.N. should be committed because she needed "inpatient, intensive attention," and because "she is subject to, or she did display, or does have a disturbance [of

mood]." The trial court specifically declined to make a finding regarding whether N.N.'s mother consented to the commitment.

The Public Defender appealed the case to the Appellate Division, and then petitioned for certification of the appeal pending unheard. This Court granted certification. 142 *N.J.* 442, 663 *A.*2d 1352 (1995).

## II

The United States Supreme Court has recognized that juveniles subject to involuntary commitment have significant liberty interests and are entitled to due process protections. *Parham v. J.R.*, 442 *U.S.* 584, 601, 99 *S.Ct.* 2493, 2504, 61 *L.Ed.*2d 101, 118 (1979). "Because commitment effects a great restraint on individual liberty," this Court has stated that "this power of the State is constitutionally bounded," and its exercise must "comply with due process." *In re S.L.*, 94 *N.J.* 128, 137, 462 *A.*2d 1252 (1983) (citations omitted). The fundamental issue posed by this appeal relates to the standard that must be followed by the State when it exercises its power to commit involuntarily a minor to an institution for psychiatric treatment. The issue is of constitutional dimension.

The standards governing civil commitment are provided by statute at *N.J.S.A.* 30:4–27.1 to –27.23, and in the current Rules of Court, *Rule* 4:74–7. The issue in this case involves the provisions for involuntary commitment contained in the Rules at *R.* 4:74–7(f). That rule specifies the commitment standard applicable to adults:

> The court shall enter an order authorizing the involuntary commitment of an adult patient if it finds, by clear and convincing evidence presented at the hearing that the patient is in need of continued involuntary commitment by reason of the fact that (1) the patient is mentally ill, (2) mental illness causes the patient to be dangerous to self or dangerous to others or property as defined in *N.J.S.A.* 30:4–27.2h and -.2i, (3) the patient is unwilling to be admitted to a facility for voluntary care, and (4) the patient needs care at a short-term care or psychiatric facility or special psychiatric hospital because other services are not appropriate or available to meet the patient's mental health care needs.
>
> [*Ibid.*]

The involuntary commitment of a minor is governed by an alternative standard, *viz*:

Alternatively, if the patient is a minor, the order may be entered if the court finds that the patient is in need of intensive psychiatric therapy that cannot practically or feasibly be rendered in the home or in the community or on an outpatient basis.

[*Ibid.*]

That alternative standard (hereinafter also referred to as the "necessary-treatment" standard) omits any need to demonstrate a mental illness that causes dangerousness to self or others. It requires, instead, the need of intensive psychiatric therapy. It is contended that the standard is vague, and by its failure to require as a condition for involuntary commitment mental illness that causes dangerousness to self or others, it violates due process.

The alternative, necessary-treatment standard for the involuntary commitment of minors has an extensive history that explains its meaning and purpose. That history, therefore, is relevant to the constitutional adequacy of the necessary-treatment standard governing involuntary commitments of minors.

The current rules on civil commitment were drafted pursuant to this Court's request to its Committee on Civil Practice to formulate standards and procedures for involuntary commitments that would address the inadequacies of prior laws, and would incorporate the rulings of then-current decisions.[1] Report of the Supreme Court Civil Practice Committee, 98 *N.J.L.J.* 377, 387–88 (1975). The Court anticipated at the same time that the Legislature would enact legislation that would provide the basis for involuntary commitments. The rules were adopted by the Court in 1975, and were revised in 1976. The 1976 revisions contained the alternative standard for minors, which provided a "need of intensive psychiatric therapy" as the criterion for involuntary commitment of a minor. It omitted any requirement of a demon-

---

1 "A general revision of the rule was clearly required in order to correct a long standing history of procedural abuses in the civil commitment process and to insure that no person may be involuntarily committed to a psychiatric institution without having been afforded full procedural due process." Comment to *R.* 4:74–7 (citing *O'Connor v. Donaldson,* 422 *U.S.* 563, 95 *S.Ct.* 2486, 45 *L.Ed.*2d 396 (1975); *In re Geraghty,* 68 *N.J.* 209, 343 *A.*2d 737 (1975)).

stration of dangerousness to self or others as a basis for involuntary commitment. According to the Comment to the Rule, that criterion was adopted partly due to "the recognition that the 'probable-danger' standard is not applicable to children, at least not in the same way that it is in the case of adults." Pressler, *Current N.J. Court Rules,* comment 1, on *Rule* 4:74–7(b) (1995).

The Public Advocate[2] had opposed the necessary-treatment standard for minors contained in the 1976 rule. It contended that there was no reason that the commitment standard for children should be different from that applied to adults, and that there was no documentation indicating that the "dangerousness" standard could not be used in juvenile commitments. Despite those criticisms, the alternative standard for juvenile commitments, based on a finding that the minor is in "need of intensive psychiatric therapy which cannot practically or feasibly be rendered in the home or in the community or on an outpatient basis," was adopted.

In 1987, the Legislature enacted the current involuntary commitment statute. *N.J.S.A.* 30:4–27.1 to –27.23. The statute provides a uniform standard for involuntary commitment, requiring a showing by clear and convincing evidence that the patient suffers from a mental illness and poses a danger to self, others or property. *N.J.S.A.* 30:4–27.2m; *N.J.S.A.* 30:4–27.15a. Through its definition of "patient" as a person over age eighteen, the statute's application is limited to adults. *N.J.S.A.* 30:4–27.2s. The prior statute, which governed commitments of minors as well as adults, *N.J.S.A.* 30:4–46, was repealed by the new statute, effective June 7, 1989. Because the 1987 statute was limited to adults, the repeal of the prior statute eliminated all statutory authority for the commitment of minors. Though legislation pertaining to juvenile commitments was anticipated at the time of passage of the new

---

[2] The Department of the Public Advocate was abolished effective July 1, 1994. *N.J.S.A.* 52:27E–51a. The authority and responsibilities of that office have in part been assumed by the Office of the Public Defender. *N.J.S.A.* 52:27E–51b.

statute, no such statute has been enacted.[3] Thus *Rule* 4:74–7, as revised in 1976, is the only codified standard applicable to the commitment of minors.

The juvenile commitment standard of *Rule* 4:74–7 was again challenged in 1991, when the Public Advocate requested a revision of the Rule. The challenge reflected its earlier concerns about the inadequacies of the Rule's standard in protecting juveniles. Specifically, the Public Advocate criticized the Rule's failure to require findings of mental illness and dangerousness as conditions for involuntary commitment. The Supreme Court Committee on Civil Practice remanded the matter of juvenile commitments to a Subcommittee on Mental Commitments, which produced a recommendation. *Report of the Mental Commitments Subcommittee of the Civil Practice Committee* (Dec. 1993) (hereinafter *"Subcommittee Report"*). The Subcommittee recommended that a finding of mental illness constitute an explicit prerequisite for the involuntary commitment of a minor. According to the Subcommittee's report, it believed that by implication the juvenile standard incorporated the mental illness requirement of the adult standard. That conclusion was based on its understanding that a finding of mental illness was constitutionally fundamental for involuntary commitment. The Subcommittee further noted that the official commitment forms used by examining psychiatrists required a finding of mental illness, thereby making a finding of mental illness a functional requirement for commitment and an accepted practice of the psychiatric community.

The Subcommittee also recommended a commitment standard for minors based on "dangerousness to self or others or property." That proposed dangerousness standard, however, was not mandatory. The recommendation proposed retaining the necessary-treatment standard as an alternative criterion. The Subcommit-

---

[3] *See* "Report of Assembly Health and Human Resources Committee," Statement to Assembly, No. 1813 (Oct. 9, 1986): "This bill addresses commitment standards and procedures for adults; standards and procedures for minors will be addressed in a separate bill."

tee stated that the primary requirement of a finding of mental illness and the alternative requirement based on either dangerousness or necessary treatment were changes in conformity with the "Certificate for Involuntary Commitment of a Minor" of the Department of Human Services, which required the certifying psychiatrist to make findings of dangerousness or of a need for treatment.

A minority of the Subcommittee on Mental Commitments issued a separate report that proposed a standard for involuntary juvenile commitment reflecting the position of the Public Advocate. That standard required a finding of dangerousness to self, others or property as defined by the provisions of *N.J.S.A.* 30:4–27.2h and –27.2i, the statutory provisions applicable to adults. The proposal also included changes to the voluntary commitment standards for minors. Its proposed standard differentiated between minors under the age of fourteen and those fourteen years and older: voluntary commitment for a minor age fourteen or over would require the consent of the minor, but if the minor was under fourteen, the parent or parents could consent to the commitment.

Although the Public Advocate's proposal, endorsed by the Subcommittee minority, approved a requirement of dangerousness identical to the adult standard, it explicitly required a finding of "childhood mental illness" as a precondition of commitment. It defined mental illness in children as

> a current substantial disturbance of thought, mood, perception, or orientation from that which is typical of children at a similar developmental stage and which significantly impairs judgement, functioning, or capacity to recognize reality *as compared to children at a similar developmental stage.* The presence of a seizure disorder, developmental disability, organic brain syndrome, physical or sensory handicap, or of brief periods of intoxication caused by alcohol or another substance is not sufficient to satisfy the criteria for childhood mental illness, but does not exclude a child otherwise determined to satisfy those criteria.
>
> [Letter from Alma L. Saravia, Director, Division of Mental Health Advocacy, Department of the Public Advocate, to Deborah T. Poritz, Chair, Subcommittee on Mental Health, Supreme Court Committee on Civil Practice (April 5, 1993) (reprinted in *Subcommittee Report* (emphasis added))].

That definition essentially mirrors the adult definition of mental illness, *N.J.S.A.* 30:4–27.2r, with an important modification: it

requires a comparison of the patient's condition with that of children "at a similar developmental stage." The definition thus modifies the general adult standard of mental illness to allow treatment for children who may not display traits of mental illness on an adult scale, but who may show evidence of mental illness in comparison to children of similar age or developmental level. In support of the separate definition for childhood mental illness, one comment indicated: "Without such a definition [oriented towards children], the proper identification and possible commitment of seriously mentally ill youth may not occur." Letter from Hugh J. Adams, Mental Health Administrator, Mercer County Mental Health Board to Keith Endo, Counsel to the Director, Administrative Office of the Courts (June 29, 1994).

The Civil Practice Committee accepted the Subcommittee majority's proposal with certain modifications. The rule that it proposed addresses only minors under the age of fourteen. All minors fourteen years old and older would be governed by the adult standard for commitment, which requires a finding of mental illness and dangerousness to self or others. The proposed rule would provide an alternative commitment standard for minors up to fourteen years. That standard requires a finding of mental illness. It further requires, in the alternative, "dangerousness" or a "need of intensive [institutional] psychiatric therapy," *viz:*

> If however, the patient is a minor under the age of 14, the order may also be entered if the court finds that the patient is mentally ill and either that the mental illness causes the patient to be dangerous to self or others or property, or that the patient is in need of intensive psychiatric therapy that can be provided at a psychiatric hospital and that cannot practically or feasibly be rendered in the home or in the community or on an outpatient basis.

> [Proposed *Rule* 4:74–7(f).]

The present appeal arose before the proposed rule could be considered by the Court. Accordingly, the Court declined to act on the proposals, deciding instead to determine the standards that must govern the involuntary commitment of minors through the adjudication of this case. We thus proceed to consider on the basis of the record and in the context of this case what substantive

standards are constitutionally required in order to authorize the involuntary commitment of a minor.

We note further that at the time of her involuntary commitment, N.N. was over the age of fourteen and was no longer confined when this appeal was filed. Nevertheless, we conclude that a decision by this Court is necessary though the case as it applies to N.N. is moot. The issues posed by this case involve significant matters of public policy, are extremely important, and undoubtedly will recur in cases that are likely to be mooted before adjudication. *See, e.g., In re Farrell,* 108 *N.J.* 335, 347, 529 *A.*2d 404 (1987); *In re Conroy,* 98 *N.J.* 321, 342, 486 *A.*2d 1209 (1985).

## III

There is general agreement that mental illness is a prerequisite for the involuntary commitment of minors. The necessity of a finding of mental illness as a condition for involuntary commitment is consistent with both the federal constitutional standard, *Foucha v. Louisiana,* 504 *U.S.* 71, 80, 112 *S.Ct.* 1780, 1786, 118 *L.Ed.*2d 437, 448 (1992); *Vitek v. Jones,* 445 *U.S.* 480, 492–93, 100 *S.Ct.* 1254, 1263, 63 *L. Ed.*2d 552, 564–65 (1980); *Parham v. J.R.,* 442 *U.S.* 584, 609, 99 *S.Ct.* 2493, 2507, 61 *L. Ed.*2d 101, 123 (1979); *O'Connor v. Donaldson,* 422 *U.S.* 563, 573–76, 95 *S.Ct.* 2486, 2492–2494, 45 *L. Ed.*2d 396, 406–08 (1975), and with State constitutional principles. *In re S.L., supra,* 94 *N.J.* at 138, 462 *A.*2d 1252; *State v. Krol,* 68 *N.J.* 236, 252–53, 344 *A.*2d 289 (1975).

We construe the current Rule to require mental illness as a precondition for involuntary commitment. As suggested by the Attorney General, the alternative standard contained in current *Rule* 4:74–7(f) must be read in conjunction with *Rule* 4:74–7(k), which provides that "a minor shall be institutionalized *for the treatment of mental illness* only upon a court order entered in accordance with the procedures prescribed by paragraphs b through g . . . ." (Emphasis added). Additionally, the Department of Human Services "Certificate for Involuntary Commitment

of a Minor" requires that the examining psychiatrist make such a finding of mental illness.

Although not explicit or precise, the Rule clearly contemplates that the purpose of the commitment standard is to authorize involuntary hospitalization of the mentally ill, and, by implication, such a consideration of mental illness must be undertaken in proceedings affecting minors under the alternative standard. Regardless of whether the requirement for such a finding of mental illness is implied by reference to the adult statute, or is presupposed by the official clinical forms completed by the examining psychiatrist, which require such a finding, we conclude that a requirement of mental illness is indispensable as a prerequisite to the commitment determination applicable to minors.

We note that the Public Advocate included in its proposals for rule revisions a definition of "childhood mental illness" that was essentially similar to the definition of mental illness currently provided by *Rule* 4:74-7(a) for use in adult commitment proceedings. The proposed definition provides a basic explanation of the elements of "mental illness." However, it further requires a comparison of the mental condition of the minor facing commitment proceedings with the mental condition of a child "at a similar developmental stage." *See* discussion *supra* at 122–123, 679 *A*.2d at 1179–1180 (quoting proposed definition of "childhood mental illness").

We believe that a definition of mental illness with the focus on such a comparison will be beneficial to children with significant mental disorders and will aid in insuring that such children will have the realistic opportunity to receive treatment, while serving to prevent the inappropriate involuntary placements of children whose mental condition is consistent with that of other children at their level of development. Because civil commitment implicates significant individual liberty interests of minors, we conclude that the protections necessary to adequately safeguard these interests reasonably require a clear and convincing demonstration that the minor is suffering from or afflicted with a mental illness, before

commitment can be authorized. The standard for the involuntary commitment of minors must include a requirement of "childhood mental illness" defined in comparative developmental terms.

## IV

The Public Defender argues that the present alternative standard for the commitment of minors, which requires only a finding that an individual "is in need of intensive psychiatric therapy that cannot practically or feasibly be rendered in the home or in the community or on an outpatient basis," is impermissibly vague and insufficiently protective of the important liberty interests of minors, and, therefore, constitutes a violation of due process.

### A.

Constitutional analysis for determining the vagueness of statutory provisions is well-settled. Drawing from the authority of the United State Supreme Court in *Grayned v. City of Rockford,* 408 *U.S.* 104, 108–09, 92 *S.Ct.* 2294, 2298–99, 33 *L.Ed.*2d 222, 227–28 (1972), this Court observed in *State v. Cameron* that "the requirement of statutory clarity is essentially a due process concept grounded in notions of fair play." 100 *N.J.* 586, 591, 498 *A.*2d 1217 (1985) (citations omitted). The purpose of the constitutional ban on vague laws is "to invalidate regulatory enactments that fail to provide adequate notice of their scope and sufficient guidance for their application." *Ibid.* Those who are affected by the law— those who are responsible for its administration and those who are subject to its imposition—should not "necessarily guess at its meaning and differ as to its application." *Coates v. Cincinnati,* 402 *U.S.* 611, 614, 91 *S.Ct.* 1686, 1688, 29 *L. Ed.*2d 214, 217 (1971); *In re Petition of Soto,* 236 *N.J.Super.* 303, 327, 565 *A.*2d 1088 (App.Div.1989), *certif. denied,* 121 *N.J.* 608, 583 *A.*2d 310, *cert. denied,* 496 *U.S.* 937, 110 *S.Ct.* 3216, 110 *L. Ed.*2d 664 (1990). Further, "[t]he determination of vagueness must be made against the contextual background of the particular law and with a firm

understanding of its purpose." *Cameron, supra,* 100 *N.J.* at 591, 498 *A.*2d 1217.

There is no doubt that the constitutional liberty interests that are implicated in the context of civil commitment proceedings are sensitive and substantial. *Parham v. J.R., supra,* 442 *U.S.* at 601, 99 *S.Ct.* at 2504, 61 *L.Ed.*2d at 118. Involuntary commitment "effects a great restraint on individual liberty" and therefore the State must comply with due process when restraining the liberty of its citizens through involuntary commitment. *In re S.L., supra,* 94 *N.J.* at 137, 462 *A.*2d 1252 (citations omitted). Consequently, in light of the significant constitutional freedoms at stake in commitment proceedings, the necessary-treatment standard for juvenile commitment must receive careful scrutiny to determine whether it is clear and understandable and provides adequate substantive protections.

The Public Defender contends that the alternative standard itself is devoid of a common general meaning or understanding and has no established scientific, professional or technical meaning in either a legal or medical context. The phrase "in need of intensive psychiatric therapy" is not defined in the Rule, nor in any statute or case; it is not a phrase recognized in the *Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 1994), the standard source of classification and nomenclature for the American Psychiatric Association. The Public Defender notes that "intensive psychiatric therapy" "could mean anything from the use of medication to occasional counseling or *anything else* a particular physician might wish to recommend." She further claims that the infirmities of the standard are not remedied by the modifying phrase: "which cannot practically or feasibly be rendered in the home or in the community or on an outpatient basis." She argues that if "intensive psychiatric therapy" cannot easily be defined, then it is impossible to determine whether such services could be provided in the home or in the community or on an outpatient basis.

The Attorney General argues that the phrase "in need of intensive psychiatric therapy" essentially denotes inpatient therapy, and relies on an analogy to "intensive care" as informing that interpretation of the standard. *See Modern Dictionary for the Legal Profession* 448 (1993). The Attorney General, therefore, contends that the standard applies to situations in which "moderate, occasional or intermittent therapy" are not sufficient, thus indicating inpatient care.

The provisions of the alternative standard take on meaning from its context. The standard is included within the Rules dealing with "Civil Commitment," and is part of a section entitled "Final Order of Commitment." *R.* 4:74–7; *R.* 4:74–7(f). Other provisions of section (f) refer to commitment of adults to "a short-term care or psychiatric facility or special psychiatric hospital," indicating that, in general, commitment involves confinement to such institutions. The inference to be drawn is that "intensive psychiatric therapy" necessarily would entail institutional treatment.

Moreover, the exclusionary language of the balance of the Rule also implies that inpatient treatment would be reflected in the "need of intensive psychiatric therapy." Under the standard, commitment would not be justified for minors whose need of treatment could be adequately provided on an outpatient basis. Further, the Civil Practice Committee's proposed juvenile commitment standard also associates the need for intensive psychiatric therapy with the need for inpatient treatment at a psychiatric hospital. The proposed alternative standard is premised on a "need of intensive psychiatric treatment that can be provided at a psychiatric hospital." The clear implication is that such treatment would necessarily consist of inpatient care. Certainly, that proposed revision clarifies the language of the existing rule, and, as claimed by the Attorney General, supports an implied congruence between the "need of intensive psychiatric therapy that cannot practically or feasibly be rendered in the home or in the community or on an outpatient basis" and a need for inpatient treatment in a psychiatric institution.

■ We accordingly determine that the language of the alternative standard denotes minimally that involuntary commitment must be based on a showing of a need for inpatient care, consisting of intensive psychiatric therapy that can be provided only at a psychiatric hospital. That meaning, we conclude, is sufficient to overcome the claim of constitutional vagueness.

### B.

The determination that the current standard for juvenile involuntary commitment, based on necessary treatment, has a sufficiently understandable meaning to satisfy constitutional vagueness concerns advances the significant cognate issue: whether that standard satisfies constitutional due process. That issue may be posed in terms of whether the standard vindicates a compelling state interest sufficient to justify the loss of liberties entailed in the involuntary civil commitment of minors.

We note that other jurisdictions have invalidated commitment standards that are premised on a "need for treatment" basis because such a standard is too vague to ensure reasonable and sound applications and therefore insufficiently protective of liberty interests. *E.g., Colyar v. Third Judicial District Court,* 469 *F.Supp.* 424, 429 (D.Utah 1979); *Stamus v. Leonhardt,* 414 *F.Supp.* 439, 451 (S.D.Iowa 1976); *Doremus v. Farrell,* 407 *F.Supp.* 509, 514–15 (D.Neb.1975). In *Johnson v. Solomon,* 484 *F.Supp.* 278 (D.Md.1979), a juvenile commitment statute provided for commitment under either a dangerousness test or a need-for-treatment standard. The court found that the " 'in need of care' standard was impermissibly vague because it lacked the degree of specificity mandated by due process considerations in light of the serious nature of the child's loss of liberty." *Id.* at 284 (citations omitted).

■ "The authority of the State to civilly commit citizens is said to be an exercise of its police power to protect the citizenry and its *parens patriae* authority to act on behalf of those unable to act in their own best interests." *In re S.L., supra,* 94 *N.J.* at 136,

462 *A*.2d 1252 (citations omitted). However, "[t]he civil commitment process must be narrowly circumscribed because of the extraordinary degree of state control it exerts over a citizen's autonomy." *Id.* at 139, 462 *A*.2d 1252. Thus, the Court has recognized that under the *parens patriae* authority, "[t]he State cannot constitutionally commit individuals to mental hospitals solely on the basis of mental illness." *Id.* at 137, 462 *A*.2d 1252. The *parens patriae* power to authorize involuntary commitment is generally restricted to instances in which the individual poses a danger to self. *See Addington v. Texas,* 441 *U.S.* 418, 426, 99 *S.Ct.* 1804, 1809, 60 *L.Ed.*2d 323, 331 (1979). We recognize that: "In order to justify commitment in New Jersey the State must show that an individual is likely to pose a danger to self or others or property by reason of mental illness." *In re S.L., supra,* 94 *N.J.* at 138, 462 *A*.2d 1252 (citing *State v. Krol, supra,* 68 *N.J.* at 257, 344 *A*.2d 289). Moreover, the risk of dangerousness that will warrant involuntary commitment must be relatively immediate: "Commitment requires that there be a substantial risk of dangerous conduct within the reasonably foreseeable future." *State v. Krol, supra,* 68 *N.J.* at 260, 344 *A*.2d 289; *N.J.S.A.* 30:4–27.2, *see Doremus v. Farrell, supra,* 407 *F. Supp.* at 514 ("[i]n the mental health field, where diagnosis and treatment are uncertain, the need for treatment without some degree of imminent harm to the person or dangerousness to society is not a compelling justification" for involuntary commitment).

Significantly, the Legislature in the enactment of the 1987 civil commitment statute confirmed the essentiality of a finding of dangerousness as a necessary precondition to involuntary commitment:

> Because involuntary commitment entails certain deprivations of liberty, it is necessary that State law balance the basic value of liberty with the need for safety and treatment, a balance that is difficult to effect because of the limited ability to predict behavior; and, therefore, it is necessary that State law provide clear standards and procedural safeguards that ensure that only those persons who are dangerous to themselves, to others or to property, are involuntarily committed.

*    *    *    *    *    *    *    *

Furthermore, it is the policy of this state that the public mental health system shall be developed in a manner which protects the individual liberty and provides advocacy and due process for persons receiving treatment and insures that treatment is provided in a manner consistent with a person's clinical condition. [*N.J.S.A.* 30:4–27.1b, –27.1c].

The State assuredly has a deep and abiding interest in insuring the mental health and well-being of its children. That interest clearly authorizes the State to provide treatment and care for children who suffer from mental illness, and who may benefit from such care. However, that interest, while significant, is not sufficiently compelling to justify the curtailment of a child's liberty interests by involuntary commitment to a psychiatric hospital. *Johnson v. Solomon, supra,* 484 *F.Supp.* at 287 (noting that, "in the specific context of involuntary commitment to a mental hospital where the deprivation of liberty is very great, and the possibility of stigmatization is very real, the mere *possibility* of benefit is not enough to justify such official paternalism"); *Colyar, supra,* 469 *F.Supp.* at 429; *cf.* Lois A. Weithorn, *Mental Hospitalization of Troublesome Youth: An Analysis of Skyrocketing Admission Rates,* 40 *Stan. L.Rev.* 773, 797 (1988) (noting inappropriate hospitalization can have serious adverse psychological consequences that must be considered when weighing compelling interests at stake in authorizing involuntary commitment).

There has been some recognition that in the case of minors a need-for-treatment standard does not express a State interest sufficiently compelling to warrant a child's loss of liberty through involuntary civil commitment. *See Johnson v. Solomon, supra,* 484 *F.Supp.* at 284 (ruling that need-of-care standard did not satisfy due process "in light of the serious nature of the child's loss of liberty," citing *Colyar, supra,* 469 *F.Supp.* at 429 (ruling in adult commitment case that only compelling State interest sufficient to offset loss of individual liberties at stake in commitment process would be State's interest in protecting citizens who posed danger to themselves)). We, therefore, determine that a standard based only on the "need of intensive [institutional] psychiatric therapy" as the condition for the involuntary commitment of a

minor does not vindicate a compelling state interest, and is insufficient to protect the individual liberty interests of such a minor. We hold that the involuntary commitment of a minor who is mentally ill and found to be in need of intensive institutional psychiatric therapy may not be undertaken without a finding based on clear and convincing evidence that the minor without such care is a danger to others or self.

The statute recognizes and requires dangerousness as a basis for involuntary commitment. *N.J.S.A.* 30:4–27.1b; –27.2m. However, that statute is applicable only to adults. *Supra* at 120–121, 679 *A.*2d at 1178–1179. The current rule's alternative standard pertaining to minors omits any requirement of dangerousness. The proposed rule likewise fails to require dangerousness as a condition for the involuntary commitment of minors.

We must acknowledge the cogent criticisms of the adult "dangerousness" standard in the context of minors in need of commitment. The dangerousness standard, as traditionally understood and applied to adults, may be regarded as inappropriate and insufficient when sought to be applied to minors. That standard is typically formulated in terms of the potential for suicide or infliction of physical injury to oneself. *Cf.* Louisiana Childrens' Code, *La. Ch.C.*, art. 1404 (West, 1991) (defining dangerousness to self to include the risk that a person "will inflict physical or *severe emotional harm* upon his own person"); *La.Rev.Stat.Ann.* § 28:2(4) (same). The standard also encompasses the inability to provide for oneself the basic necessities of life, such as food, clothing or shelter. *N.J.S.A.* 30:4–27h. *See Colyar, supra,* 469 *F.Supp.* at 430–31; *Stamus v. Leonhardt, supra,* 414 *F.Supp.* at 451; *Doremus v. Farrell, supra,* 407 *F.Supp.* at 514–15; *In re Roger S.,* 19 *Cal.*3d 921, 141 *Cal.Rptr.* 298, 569 *P.*2d 1286 (1977) (describing dangerousness to self based on inability to secure basic necessities as the "gravely disabled" standard).

The traditional concept of dangerousness that extends to one who is "gravely disabled" is appropriate in the case of adults, whose rights and presumed capacity to refuse treatment for

mental illness necessarily requires a strict and limited standard before the refusal of treatment may be overridden by the police or *parens patriae* power of the State. "[A] State cannot constitutionally confine without more a nondangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends." *O'Connor v. Donaldson, supra,* 422 *U.S.* at 576, 95 *S.Ct.* at 2494, 45 *L.Ed.*2d at 407. Nevertheless, the application of such a concept of "dangerousness" in the context of juvenile commitments may be inappropriate. *Cf. In re S.C.,* 280 *Pa.Super.* 539, 421 *A.*2d 853, 856–57 (1980) (applying adult standard of dangerousness to minor aged 16). Most children are ordinarily dependent on others for life's necessities. They do not have the opportunity to demonstrate that they are "capable of surviving safely in freedom." Thus, the "gravely disabled" sense of dangerousness is ill-suited to identify minors who have seriously harmful conditions. *Cf. In re Roger S., supra,* 141 *Cal.Rptr.* 298, 569 *P.*2d at 1293 n. 7 (applying statutory definition that "a person of any age may be 'gravely disabled.' ") Because it is to be strictly and narrowly applied, such a dangerousness standard could exclude mentally ill children whose condition places them in significant physical or mental peril and who should be treated even on an involuntary basis.

The alternative standard for minors under the proposed rule, as noted, diverges from the adult standard of dangerousness by requiring "dangerousness" only as an alternative to the necessary-treatment basis for juvenile commitment. That difference in approach by the Civil Practice Committee responds to the criticisms of the adult dangerousness standard as applied to minors, and acknowledges the uncertainty and difficulty in applying the concept of dangerousness to children. *See* Pressler, *Current N.J. Court Rules,* comment 1, on *R.* 4:74–7(b)(1995). The Committee's position also reflects the desire not to foreclose needed and appropriate treatment for those children, not dangerous by adult measures, who seriously require intensive psychiatric therapy. *See id.*

134

The calculus of the commitment decision changes in the case of minors. Their well-being has always been a concern of the State. *E.g. Hoefers v. Jones,* 288 *N.J.Super.* 590, 607, 672 *A.*2d 1299 (Ch.Div.1994) ("As it relates specifically to children's issues and the rights of children, *parens patriae* is the philosophical source of state law, of public policy governing their general welfare, best interests, right of protection, right to be free from harm and abuse."), *aff'd* 288 *N.J.Super.* 478, 672 *A.*2d 1177 (App. Div.1996). "The State as parens patriae may act to protect minor children from serious physical or emotional harm." *In re Dept. of Pub. Welfare,* 383 *Mass.* 573, 421 *N.E.*2d 28, 36 (1981).

We have long recognized in a variety of settings that the State has an interest in providing adequate treatment of juveniles when that treatment is medically necessary to correct and remedy demonstrated emotional, psychological or behavioral problems of a severity that could endanger future personality development. *New Jersey Div. of Youth and Family Services v. A.W.,* 103 *N.J.* 591, 603–605, 512 *A.*2d 438 (1986) (explaining in context of termination of parental rights the significance of "serious impairment of the child's health or development"); *Sorentino v. Family and Children's Society of Elizabeth,* 72 *N.J.* 127, 132, 367 *A.*2d 1168 (1976) (stating in context of custody dispute, "[t]he possibility of serious psychological harm to the child in [such] case[s] transcends all other considerations"); *Kattermann v. DiPiazza,* 151 *N.J.Super.* 209, 214 n. 1, 376 *A.*2d 955 (App.Div.1977) ("We recognize that the responsibility of the court as *parens patriae* of all minor children transcends all other considerations when there exits a potential for serious psychological harm to a child.") The prospect that "[t]he child's health and development either have been or will be seriously impaired" will justify the exercise of the State's *parens patriae* authority. *In re Guardianship of A.A.M.,* 268 *N.J.Super.* 533, 543, 634 *A.*2d 116 (App.Div.1993) (construing statute governing termination of parental rights).

The liberty interests of children have traditionally been more circumscribed and subject to greater state control than those

of adults: "The liberty interest of a minor is qualitatively different than that of an adult, being subject ... to reasonable regulation by the state to an extent not permissible with adults." *In re Roger S., supra,* 141 *Cal.Rptr.* 298, 569 *P.*2d at 1294 (1977) (citing *Planned Parenthood of Cent. Mo. v. Danforth,* 428 *U.S.* 52, 72, 96 *S.Ct.* 2831, 2843, 49 *L. Ed.*2d 788, 806 (1976)); *Ginsberg v. New York,* 390 *U.S.* 629, 638, 88 *S.Ct.* 1274, 1280, 20 *L. Ed.*2d 195, 203 (1968); *Prince v. Massachusetts,* 321 *U.S.* 158, 170, 64 *S.Ct.* 438, 443, 88 *L. Ed.* 645 (1944). The criteria for the commitment of minors based on dangerousness must therefore reflect their heightened needs and vulnerability and the State's concomitant greater responsibility to assure their health and well-being.

We have now recognized and determined that, in the context of involuntary commitments, the concept of "mental illness" that constitutes a condition for the involuntary commitment of a minor must be adapted and related to juveniles as a class, and must take into account the characteristics and needs that are unique to the young, immature, and developing person. Mental illness in a child must be correlated and evaluated in terms of a comparison with similar children, *see* discussion, *supra,* at 124–125, 679 *A.*2d at 1180–1181. Likewise, the use of "dangerousness" to describe and identify an aspect of the child's mental condition must also take into account the distinctive nature of children. "Because children are still developing, the physical and emotional aspects are more closely intertwined than they are for an adult." American Academy of Child and Adolescent Psychiatry, *Child and Adolescent Psychiatric Illness: Guidelines for Treatment Resources, Quality Assurance, Peer Review and Reimbursement* 74 (1987) (hereinafter *"Guidelines for Treatment "*).

A dangerousness standard that applies to minors must be derived from and related to childhood mental illness. Childhood dangerousness must reflect the understanding that there are children with mental illnesses "whose unfolding development can be interfered with irreversibly by a lack of corrective treatment." Elyce H. Zenoff & Alan B. Zients, M.D., *"If Civil Commitment is*

*the Answer For Children, What Are the Questions?*," 51 *Geo. Wash. L.Rev.* 171, 205 (1983). "When a child's more severe psychiatric problems go untreated, that child has a greater potential not only to be chronically psychiatrically ill, but to develop costly physical problems and to experience thwarted productivity." *Guidelines for Treatment, supra,* at 74. "The child who is unable to learn, to develop affectional relationships, or to engage in other age-appropriate activities is not simply missing particular experiences at a point in time: without prompt assistance, a seriously disturbed child cannot ripen into an autonomously functioning adult." Zenoff & Zients, *supra,* at 205.

Childhood dangerousness may consist of the lasting effects that can ensue from unattended mental illness.

> Psychiatric illness in a child causes suffering in the form of symptoms such as school failure, anxiety and suicidal behavior. There is also another critical change, namely, a disruption in the child's emotional development so that he or she functions emotionally, socially or in school at a level well below that appropriate for his or her age. Untreated children who lag developmentally because of a psychiatric illness often later need more intensive treatment, including hospitalization, prolonged outpatient treatment, and partial hospitalization. The overall outcome of treatment may be less favorable, and they may never complete important developmental tasks such as graduating from high school, permanent employment and independence from parents.
>
> [*Guidelines for Treatment, supra,* at 75.]

We determine that the standard of "dangerousness to self" applicable to a child suffering from mental illness as a basis for involuntary commitment must encompass the substantial likelihood that the failure to provide immediate, intensive, institutional, psychiatric therapy will create in the reasonably foreseeable future a genuine risk of irreversible or significant harm to the child arising from the interference with or arrest of the child's growth and development and, ultimately, the child's capacity to adapt and socialize as an adult.

We address briefly in conclusion another important component of the standard governing the involuntary commitment of minors. We acknowledge that at a certain age, a juvenile will have acquired the rights of autonomy and self interest of an adult, and

therefore be entitled to the protections of constitutional due process that apply to adults. It is, of course, difficult to mark that moment. *See* Zenoff & Zients, *supra,* at 207. The Civil Practice Committee, as noted, proposed a standard that differentiates between minors under and at the age of fourteen. *Supra* at 122–123, 679 *A.*2d at 1179–1180. In the absence of a fuller record and more extended arguments directed to the status of minors as they approach the age of majority, the differentiation of minors at age fourteen, as proposed by the Civil Practice Committee, may be followed. The position reflected in the proposed rule is sensitive to the concerns for the rights of adolescents and reflects a reasoned assessment of the difficult considerations of public policy. That age-differentiated standard is based on an understanding that children possess certain constitutionally protected liberties, and that the weight and significance of those liberties increase with the age of the child. Though "there is some degree of arbitrariness" in determining at what age a child should be subject to adult hospitalization procedures, Zenoff & Zients, *supra,* at 207, a differentiation in the juvenile commitment scheme at age fourteen is consistent with other principles of New Jersey law, which afford fourteen-year-olds the right to consent to psychiatric treatment, *R.* 4:74–7(k), and allow juvenile offenders to be tried as adults, *N.J.S.A.* 2A:4A–27. We infer, without deciding, that in the absence of a contrary showing, such a differentiated standard meets the constitutional due process requirements applicable to such minors.

## V

We now hold that a standard that would authorize the involuntary commitment of a minor under fourteen years of age must first require a showing that the minor is mentally ill, as defined in terms of childhood mental illness. Secondly, it must be demonstrated that the child is in need of intensive, institutional psychiatric treatment that cannot be provided in the home, the community or on an outpatient basis. Thirdly, the minor's condi-

tion due to her mental illness must be determined to pose a danger to the minor herself or to others, which may include the substantial likelihood of significant developmental harm if that treatment is not provided. This standard further requires that these prerequisites for involuntary commitment be established by clear and convincing evidence and determined by specific and particularized findings of fact.

As earlier noted, it is not necessary to fashion a remedy addressed to N.N.'s involuntary commitment. We, nevertheless, determine that the involuntary commitment of N.N. failed to satisfy the standards that we now adopt (acknowledging, however, that she was over age fourteen when committed). The evidence was insufficient to establish that N.N. suffered a childhood mental illness and it was not established that she required intensive, institutional psychiatric therapy or that she suffered a condition of dangerousness that threatened irreversible or significant interference with her developmental capacity if such treatment were not promptly provided.

We emphasize that the standards and procedures governing involuntary juvenile commitments should be addressed by the Legislature, which can more fully explore the complex and controversial aspects of the vitally important and sensitive social and governmental concerns and responsibilities implicated in such decisions. In the meantime, within the broad constitutional bounds that we have identified, we direct that the Civil Practice Committee consider and recommend a Rule of Court to implement the standards set forth herein.

The judgment below is reversed.

*For reversal*—Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—6.

*Opposed*—None.